UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ERIN SHIRLEY,<br><br>Plaintiff<br><br>v.<br><br>VETS SECURING AMERICA, INC.,<br><br>Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Erin Shirley ("Shirley" or "Plaintiff"), by and through her undersigned counsel, and complains against the Defendant, Vets Securing America, Inc. ("VSA" or "Defendant"), as follows:

## I.     INTRODUCTION

1. This is an action brought by Plaintiff, Erin Shirley, against Defendant, Vets Securing America, Inc., for unlawful employment practices, including sex discrimination, sexual harassment, disability discrimination, and retaliation, in violation of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Maine Human Rights Act ("MHRA"), and the Maine Whistleblowers' Protection Act ("MWPA").

## II.     PARTIES

2. Plaintiff is a United States citizen residing in Baileyville, Maine.
3. Defendant, VSA, is a nationwide security firm founded in 2008, managed and staffed by veterans, which specializes in providing security for government agencies and other public

1

sector facilities. VSA maintains its mailing address at 1125 W. 190th Street, Gardena, CA 90248.

4. At the time of the relevant complaints, VSA employed approximately 1,884 employees.

### III.   JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

6. This Court has supplemental jurisdiction over Plaintiff's state law claims arising under the Maine Human Rights Act, 5 M.R.S. § 4551 *et seq.*, and the Maine Whistleblowers' Protection Act, 26 M.R.S. § 831 *et seq.*, pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

7. Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims occurred in Baileyville, Maine, and Defendant conducts business in this judicial district.

### IV.   ADMINISTRATIVE EXHAUSTION

8. Plaintiff timely filed an original Charge of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") on May 13, 2024, under Charge No. E24-0176 and 16B-2024-00374, respectively. This Complaint incorporates by reference the original and amended charges.

9. Plaintiff subsequently filed an Amended Charge of Discrimination, which she intended to be a continuation of her original charge, covering a period of discrimination from August 2022 through July 9, 2024, and continuing.

10. Plaintiff has satisfied all conditions precedent to filing this action.

## V. JURY TRIAL REQUESTED

11. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## VI. FACTUAL ALLEGATIONS

12. On or around August 15, 2022, Erin Shirley worked for Vets Securing America, Inc. (VSA), a nationwide security firm.

13. Shirley was stationed as contracted security at a local pulp plant in Baileyville, Maine, often referred to as "the Mill".

14. Shirley's job position at VSA was a security officer.

15. At the Mill, Shirley was often assigned to secure the front gates.

16. Shirley's specific post was primarily roving patrol.

17. As a security officer at the Mill, Erin Shirley's job duties included securing the Mill's front gates, which involved being inside a building with two large windows facing the gate and employee parking and two smaller windows facing the contractor entry gate to observe and make contact with arriving trucks.

18. Shirley's job duties also included performing mill patrols (roving patrol), walking through different areas of the Mill.

19. Shirley's job duties also included conducting "store calls," which involved letting supervisors and employees into a building with equipment after hours, observing what they were taking, and writing it down.

20. Shirley's job performance exceeded VSA's expectations.

**A. Sexual Harassment and Hostile Work Environment**

21. During her employment, Shirley was subjected to severe and pervasive sexual harassment by co-workers and supervisors, creating a hostile work environment.

### i.     Sexual Rumors and Blinds Incident:

22. In about August 2023, a rumor spread around the Mill that Shirley had sexual relations with a contractor.

23. The rumor was that Shirley closed the window blinds in her office while she met with a contractor so that the two of them could engage in sexual intercourse without being seen.

24. This rumor was primarily spread by co-worker Nathan May ("May") and another VSA employee named Kari Hood ("Hood"), who claimed that she walked in on Shirley and the contractor having sexual relations.

25. Shirley was subjected to intensified sexual harassment following the spread of this rumor.

26. Shirley found out about the rumor from her sister, Cody Shirley, and another employee, Ryan McIver ("McIver").

27. Shirley reported the rumor to her supervisor, Vicki Lazaro ("Lazaro"), who was the "Captain" or in charge of Shirley's security group.

28. Vicki Lazaro told Shirley that May was an "idiot", and she would "take care of it," but also dismissively stated that "they look and talk about all of us," suggesting it was not a "big deal".

29. Lazaro allegedly laughed about the harassment and took no action to stop it.

30. In direct response to the rumor, Lazaro physically removed the blinds from Plaintiff's workspace, a guard shack at the front gate with windows on all sides.

31. This action was taken because VSA believed it was a "bad look" for Shirley to be in the guard shack with a contractor and the blinds closed, implying wrongdoing, even though VSA admits no wrongdoing occurred.

32. Shirley regularly kept some of the blinds down due to her social anxiety, which made her uncomfortable with people watching her from the employee parking lot side, and also to prevent headlights from shining in her face. This had never been an issue before.

33. The removal of the blinds, coupled with the rumor that Shirley had sexual intercourse with a contractor, made Shirley feel like a "zoo animal on display" and exacerbated her social anxiety, PTSD, and depression.

34. Shirley expressed this discomfort to Vicki Lazaro, Roxanne Wait, and David Wait, explaining that she felt people were watching her and it "creeps [her] out," but Vicki Lazaro dismissed her concerns, stating it "wasn't a big deal" and she needed to "get over it".

35. For over a month and a half without blinds, Shirley repeatedly asked supervisors when they would be put back up but was told they either didn't know or that they were being cleaned.

36. On or around October 19, 2023, the blinds were put back up by Roxanne Wait ("Wait") and Randy Bowen ("Bowen"), but they had not been cleaned.

37. Roxanne Wait stated she was not part of the decision to take them down, but confirmed they were removed because of the rumor.

38. The next day, Vicki Lazaro apologized to Shirley, claiming she took the blinds down "to protect" Shirley from the rumors, but Shirley told her it only made things worse and made her look guilty.

    *ii.*    *Harassment by Co-worker/Supervisor Brandon Ireland:*

39. Between December 2023 and May 2024, Brandon Ireland, then head of safety at the Mill, subjected Plaintiff to sexual harassment.

40. Ireland sent Shirley inappropriate Snapchats, sexual memes, and pictures of himself in his boxers.

41. Ireland would also make inappropriate comments about Shirley's appearance.

42. Shirley attempted to ignore these messages, but when Ireland asked if he was annoying her, she told him his comments were inappropriate because he was married.

43. When Shirley sought help from Ireland regarding the rumor and blinds incident, he told her he "would have been mad at [her] if the rumor was true" because the contractor in question was married.

44. Shirley also heard from another female co-worker, Laura Dearborn, that Ireland had previously sent her inappropriate Snapchats, though Laura Dearborn did not object.

      ***iii.     Harassment by Co-worker Joey Dearborn:***

45. A Mill worker in the tissue department, Joey Dearborn, the brother of Laura Dearborn, made inappropriate comments about Shirley's body, such as saying she "needed the backup noise that forklifts have on [her] ass".

46. After the rumor spread, Dearborn escalated his harassment, asking Shirley when he was "going to get his contractor discount," and inquiring how many contractors she "had served that day".

47. On one occasion, while Shirley, Joey Dearborn, and another Mill employee were present, Joey Dearborn made a sexually suggestive joke referencing an "Eiffel Tower" position—a colloquial term for a group sexual act involving three individuals. The comment was made in a manner that sexualized and humiliated Shirley. Shirley found the remark offensive, inappropriate, and degrading, particularly in a professional workplace setting.

48. When Shirley expressed discomfort with his inappropriate comments, Joey Dearborn told her she "needed to learn to keep [her] mouth shut if [she] wanted to work in tissue".

49. Shirley had been trying to transfer to the tissue department at the time.

50. After Shirley walked away from a conversation where he made inappropriate comments, Joey Dearborn followed her throughout the Mill, asking why she didn't laugh, and later messaged her offering free marijuana. Shirley did not reply to Dearborn.

51. Shirley reported Joey Dearborn's comments to Vicki Lazaro as part of her protected reports of sexual harassment.

    iv.   *Harassment by Co-worker Corey Sullivan:*

52. Corey Sullivan, who worked with Joey Dearborn, also made inappropriate remarks, including asking Shirley if she "was involved in any orgies lately," as he had "heard that [she] was into that".

53. Sullivan also made comments about how Shirley "looked good wet" when it was raining. Sullivan also commented how it was wet outside and then said he was "sure [Shirley] knew all about being wet."

54. Shirley generally ignored these comments but refuted the orgy comment, stating it was based on a false rumor.

    v.   *Harassment by Supervisor David Wait:*

55. David Wait, a supervisor at the main gate, frequently gazed at Shirley.

56. David Wait, who controlled the security cameras, would misuse them to monitor Shirley.

57. David Wait would zoom in on Shirley's door when she was on patrol, making it impossible for shipping department employees to use the camera for its intended purpose of monitoring trucks.

58. Shipping crew members complained to Shirley about David Wait's misuse of the cameras. David Wait would only zoom out once Shirley had left the area.

59. David Wait repeatedly went through Shirley's personal belongings, including her drawstring bag.

60. Shirley found her bag uncinched and her items rifled through on multiple occasions.

61. On one occasion, she observed footprints leading from his side of the gate to the work truck where her bag was left, and her bag was subsequently found uncinched.

62. Shirley confronted David Wait, who denied being in the truck.

63. On another occasion, while Shirley was in the process of drafting her Maine Human Rights Commission Charge of Discrimination (the "charge of discrimination"), she left her bag at the gate. Upon her return, her bag was uncinched and appeared to have been gone through.

64. Shirley believes she was let go home early that day because her supervisors (Roxanne Wait, David Wait, and Vicki Lazaro were all present) had seen her charge of discrimination.

65. David Wait once refused to let Shirley retrieve her own jacket from her house, which was only three (3) minutes away and insisted she wear his jacket, which made her uncomfortable.

66. David Wait told Shirley that an older co-worker, Janie, refused to work with Shirley at the trucking gate because Shirley was "younger and prettier" and Janie "wouldn't want the attention brought from her onto [Shirley] from the truckers".

67. When Shirley stated she did not like the trucker attention anyway, David Wait dismissed it, saying, "Yeah, it's not that big of a deal. Boys will be boys anyways. I mean, I um can't make comments like that to you because Roxy would hit me in my pee pe cuz Roxy is his um wife".

68. Shirley reported David Wait's problematic behavior, camera misuse, and going through her belongings to Bowen after the blinds incident.

**B. Disability Discrimination**

69. Shirley is an individual with disabilities, including PTSD, social anxiety, depression, OCD, and an eating disorder, which substantially limit one or more of her major life activities.

70. Upon commencing employment, Shirley informed her supervisor, Vicki Lazaro, that she struggled with severe anxiety, especially social anxiety, which made her nervous about interactions with contractors and performing "store calls", which involves being alone with Mill workers after hours.

71. Vicki Lazaro initially assured her she would not have much interaction with contractors on overnight shifts, but Shirley's schedule quickly changed, increasing her exposure.

72. Shirley specifically informed her HR Supervisor, Roxanne Wait, about her eating disorder and her difficulty eating in front of people.

73. Shirley requested that Roxanne Wait, and others not ask her about food or comment on what she ate, especially during shutdowns when contractors provided food.

74. Despite Shirley's clear request and explanation of her eating disorder, Roxanne Wait continued to ask Shirley about food and make comments, such as "My God, Erin, do you even eat?". These comments continued even after Shirley began eating outside to avoid scrutiny.

75. Shirley also explained to Vicki Lazaro, Roxanne Wait, and David Wait that she would keep the blinds down in her guard shack due to her social anxiety and the feeling of being watched, and this had not been an issue until the rumor spread but that she was still able to monitor all areas surrounding the side of the gate.

76. Defendant VSA, through its agents, was aware of Shirley's disabilities and their impact on her.

**C. Retaliation**

77. Shirley engaged in protected activity by reporting illegal sexual harassment and discriminatory treatment to her supervisors and human resources, and by filing complaints with the MHRC and EEOC.

78. VSA retaliated against Shirley for these protected activities by terminating her employment.

79. Shirley's protected activities included:

    a. Reporting sexual harassment and the rumor to her supervisor, Vicki Lazaro, in mid-2023.

    b. Reporting sexual harassment by David Wait and the blinds situation to Randy Bowen in December 2023.

    c. Submitting a written complaint about the hostile work environment to the Baileyville Mill HR via an employee complaint box in January 2024. This complaint remained unaddressed for approximately six months until after Plaintiff filed with the MHRC.

    d. Texting VSA Regional Manager Matt Cullen on January 26, 2024, to report a hostile work environment and that her supervisors had failed to address her concerns, making things worse.

    e. Re-contacting Matt Cullen on March 7, 2024, to follow up and inform him that her hours had been cut back until she complained, and that she was filing a complaint with the Maine Human Rights Commission.

    f. Filing an Intake Questionnaire with the MHRC on March 29, 2024.

    g. Filing a formal Charge of Discrimination against VSA with the MHRC on May 13, 2024. The MHRC mailed this charge to VSA on May 31, 2024.

80. As a result of Plaintiff's complaints and protected activity, her hours were cut by approximately 8 hours per week.

81. On July 7, 2024, approximately one month after VSA was mailed Shirley's charge of discrimination, Matt Cullen informed Shirley that her assignment at the Mill was terminated, stating that the Mill did not want her back on its property due to not wearing proper protective equipment ("PPE").

82. Cullen did not offer her reassignment to another work site at that time.

83. As a result of VSA's conduct, including its failure to reassign Shirley following her removal from the Mill and the presentation of untenable reemployment conditions, Shirley was terminated from her employment or, alternatively, constructively discharged from her employment.

84. VSA's stated reason for termination – failure to wear PPE – is false and a pretext for discrimination and retaliation because of her complaints about discriminatory treatment.

85. As evidence of pretext, Shirley is aware that one or more male employees at the Mill, including those on the pulp side, who were accused of not wearing protective equipment were not fired.

86. Roxanne Wait and Vicki Lazaro admitted to speaking with only a "couple of" other VSA employees about PPE compliance. Moreover, Shirley herself was only talked to once about her hard hat by Vicki Lazaro and Gary Sousa and was generally diligent about wearing required safety glasses.

87. After her termination, in July 2024, Shirley asked Matt Cullen about options for another work assignment with VSA.

88. Cullen told her the only option might be at Dorothea Dix in Bangor, but she would have to file a new application for that potential position, and VSA would speak to her prior

11

supervisors at the Mill, making it seem unlikely she would be hired. This was a termination or, alternatively, a constructive discharge.

## COUNT I: MHRA – SEX DISCRIMINATION

### (Violation of the Maine Human Rights Act – 5 M.R.S. §§ 4572(1), 4612)

89. Plaintiff Erin Shirley is a member of a protected class on the basis of her sex (female).

90. Plaintiff was employed by Defendant Vets Securing America (VSA) and performed her job duties in a satisfactory manner.

91. During the course of her employment, Plaintiff was subjected to unwelcome conduct of a sexual nature, including:

    a. The circulation of false and sexually explicit rumors by coworkers;

    b. Inappropriate and sexually suggestive comments from supervisory and non-supervisory personnel;

    c. Repeated electronic communications of a sexual nature from a supervisor;

    d. Public humiliation by the removal of the blind which was directly tied to the rumors; and

    e. Retaliatory comments and conduct after Plaintiff objected to this treatment.

92. The conduct was based on Plaintiff's sex, was unwelcome, and was sufficiently severe or pervasive to create a hostile work environment.

93. Plaintiff reported the harassment to her supervisors, but Defendant failed to take prompt or effective remedial action.

94. As a direct and proximate result of Defendant's actions and inactions, Plaintiff suffered emotional distress, humiliation, loss of income, and other damages.

## COUNT II: TITLE VII – SEX DISCRIMINATION

### (Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2(a))

95. Plaintiff incorporates by reference the preceding paragraphs.

96. Plaintiff was subjected to unwelcome conduct of a sexual nature, including sexually explicit rumors, inappropriate messages and comments by supervisors and coworkers, and retaliatory conduct after objecting.

97. The conduct was based on Plaintiff's sex and was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile or abusive work environment.

98. Defendant knew or should have known of the conduct and failed to take immediate and appropriate corrective action.

99. Defendant's failure to act constitutes unlawful discrimination in violation of Title VII.

100. As a result, Plaintiff suffered damages including emotional distress, mental anguish, reputational harm, and loss of employment benefits.

## COUNT III: MHRA – DISABILITY DISCRIMINATION

### (Violation of the Maine Human Rights Act – 5 M.R.S. § 4572(2))

101. Plaintiff incorporates by reference all preceding paragraphs.

102. Plaintiff is an individual with physical and mental impairments, including PTSD, social anxiety, depression, OCD, and an eating disorder, which substantially limit one or more major life activities and constitute disabilities under the Maine Human Rights Act.

103. At all relevant times, Plaintiff was qualified to perform the essential functions of her job as a security officer and did so in a satisfactory manner.

104. Defendant, through its agents, was aware of Plaintiff's disabilities.

105. During her employment, Plaintiff was subjected to adverse treatment because of her disabilities, including increased scrutiny, inappropriate comments related to her condition, and ultimately, the termination of her employment.

106. The decision to terminate Plaintiff was motivated, at least in part, by discriminatory animus toward her disabilities.

107. Other similarly situated employees without disabilities were not subjected to the same treatment or termination under comparable circumstances.

108. Defendant's actions constitute unlawful discrimination based on disability in violation of the Maine Human Rights Act.

109. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer damages, including emotional distress, reputational harm, lost wages, and other economic and non-economic harm.

## COUNT IV: ADA – DISABILITY DISCRIMINATION

**(Violation of the Americans with Disabilities Act – 42 U.S.C. § 12112(a))**

110. Plaintiff incorporates by reference all preceding paragraphs.

111. Plaintiff is a qualified individual with a disability as defined by the Americans with Disabilities Act.

112. At all relevant times, Plaintiff was able to perform the essential functions of her position with Defendant.

113. Defendant knew of Plaintiff's disabilities and regarded her as disabled.

114. Defendant treated Plaintiff differently than similarly situated employees without disabilities and subjected her to adverse actions—including increased scrutiny and termination—because of her disabilities.

115. Defendant's stated reason for terminating Plaintiff's employment is false and pretextual. The true motivation for its decision was discrimination on the basis of Plaintiff's disability.

116. Defendant's conduct violates the Americans with Disabilities Act.

117. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages, including emotional distress, mental anguish, lost wages, and loss of employment benefits.

## COUNT V: MHRA – RETALIATION

### (Violation of the Maine Human Rights Act – 5 M.R.S. § 4633(1))

118. Plaintiff incorporates all prior paragraphs by reference.

119. Plaintiff engaged in protected activity under the MHRA by reporting sex discrimination, sexual harassment, and a hostile work environment.

120. Plaintiff made complaints to her supervisors and to the Mill's HR in writing. She also notified the regional manager of VSA.

121. Shortly after engaging in protected activity, Plaintiff experienced adverse employment actions, including reduced hours and eventual termination.

122. The timing and context support a causal connection between her protected activity and the adverse employment actions.

123. Defendant's stated reasons for termination were pretextual.

124. Defendant's conduct constitutes unlawful retaliation under the MHRA.

## COUNT VI: TITLE VII – RETALIATION

### (Violation of Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-3(a))

125. Plaintiff incorporates all prior paragraphs by reference.

126. Plaintiff engaged in protected activity under Title VII by:

    a. Opposing unlawful employment practices, including sex discrimination and sexual harassment in the workplace;

    b. Reporting sexually harassing conduct by coworkers and supervisors to her supervisors;

    c. Submitting a written complaint to the Mill's HR office in or around January 2024;

    d. Notifying VSA's Regional Manager, Matt Cullen, that she was experiencing a hostile work environment;

    e. Informing Defendant in March 2024 of her intent to file a charge of discrimination with the Maine Human Rights Commission (MHRC).

127. Plaintiff's complaints and opposition to discrimination constitute protected activity under 42 U.S.C. § 2000e-3(a).

128. Following these protected activities, Defendant subjected Plaintiff to adverse employment actions, including:

    a. A reduction in her scheduled work hours;

    b. Heightened scrutiny and continued inaction in response to harassment;

    c. The termination of her assignment at the Mill on July 7, 2024.

129. The adverse actions occurred under circumstances that give rise to an inference of retaliatory motive. The temporal proximity between Plaintiff's protected activity and the adverse actions further supports a causal connection.

130. Defendant's stated reasons for Plaintiff's termination—alleged safety violations—are pretextual. Plaintiff asserts that similarly situated employees were not terminated for the same or comparable conduct.

131. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including emotional distress, reputational harm, lost wages, and loss of benefits.

## COUNT VII: MWPA – WHISTLEBLOWER RETALIATION

### (Violation of the Maine Whistleblowers' Protection Act – 26 M.R.S. § 833(1))

132. Plaintiff incorporates all prior paragraphs by reference.

133. Plaintiff reported in good faith what she reasonably believed to be unlawful conduct, including sexual harassment and discrimination, to her employer and to the Maine Human Rights Commission.

134. Plaintiff's communications and complaints constitute protected activity under the Maine Whistleblowers' Protection Act.

135. Defendant subjected Plaintiff to adverse employment actions, including the termination of her assignment, as a direct and proximate result of her protected disclosures.

136. The reasons provided by Defendant were pretextual and not the true motivation for its actions.

137. Defendant's conduct violates the Whistleblowers' Protection Act.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of her rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award nominal damages;

I. Award attorneys' fees, including legal expenses, and costs;

J. Award prejudgment interest;

K. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability, sex, or retaliation;

L. Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

M. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N. Require that Defendant train all management level employees on the protections afforded by the ADA, MHRA, MWPA, and Title VII;

O. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of disability and retaliation; and

P. Grant to Plaintiff such other and further relief as may be just and proper.

Dated: September 9, 2025                    /s/ Martin P. Tartre
                                            Martin P. Tartre
                                            Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Martin@EmployeeRightsLaw.Attorney


*/s/ Chad T. Hansen*
Chad T. Hansen
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Chad@EmployeeRightsLaw.Attorney